UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
TREVOR BURKE,                                    :
                                                 :          23-CV-02111 (DEH)
                        Plaintiff,           :
                                                 :
        - against -                             :
                                                 :
CONSOLIDATED EDISON COMPANY OF NEW               :
YORK, INC.,                                      :
                                                 :
                        Defendant.           :
------------------------------------------------------------------------x

**DEFENDANT'S LOCAL CIVIL RULE 56.1 REPLY TO PLAINTIFF'S "FURTHER STATEMENT OF MATERIAL FACTS IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT"**

Defendant Consolidated Edison Company of New York, Inc. ("Con Edison" or "Defendant"), by its attorneys, pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, submits this Reply to Plaintiff's "Further Statement of Material Facts in Opposition to the Defendant's Motion for Summary Judgment" as set forth in numbered paragraphs 65-98 of Plaintiff's Response to Defendant's Local Civil Rule 56.1 Statement of Material Facts.

    Each entry in "Plaintiff's Additional Statements of Material Facts" is reproduced in its entirety below, followed in each instance by Defendant's response.

    65.    Plaintiff's entry: "ConEd was Plaintiff's sole paid employment Plaintiff held in the United States in the 6 years from his immigration in November 2013 to his wrongful termination in September 2021. Plaintiff intended to work at ConEd until his retirement. (Pl. Affirm. ¶ 3)."

    <u>Defendant's response</u>: Denied. Additionally, Plaintiff's characterization of the termination of his employment as a "wrongful termination" constitutes legal argument, not a

factual statement, and therefore, should not be considered by the Court. (Pl. Dep. 17-19; Sidhom Decl. ¶¶ 4-8; Griffin Dep. 65-66; Def. Exh. W).

66.  Plaintiff's entry: "The demands required of Plaintiff as Mechanic B, and later an Emergency Gas Troubleshooter, included the following:

   a. Driving to and from jobs;

   b. Using the communications radio;

   c. Lifting and carrying 15 to 50 pounds;

   d. Using simple tools weighing 2.5 to 10 pounds, such as wrenches, prior bars, gauges, and drills;

   e. Performing routine gas inspections;

   f. Making informed guesses about gas leak locations and decisions about how best to approach the job based on knowledge of the gas distribution systems and meters;

   g. Completing paperwork after a site visit, including an activity report and any relevant drawings of the site.

(Pl. Affirm. ¶ 9)."

Defendant's response: Admitted to the extent Plaintiff's entry includes some but not all of the "demands required of" him as a Mechanic B and later an Emergency Gas Troubleshooter.

67.  Plaintiff's entry: "The main purpose of an Emergency Gas Troubleshooter is to investigate a gas concern and make the location of a gas leak safe. Gas leaks were not found at every job site to which Emergency Gas Troubleshooters were dispatched. (Kulpa Decl. ¶ 5; Pl. Ex. 17, Pl. Dep 24-27, 73-74; Pl. Affirm. ¶ 4)."

Defendant's response: Admitted in part. The "main purpose" of an Emergency Gas Troubleshooter also included acting as a first responder, often arriving alone at the scene of a gas

leak, with the ability to take immediate action to make the situation safe – which included the ability to engage in strenuous physical labor and to lift and carry objects weighing up to 50 pounds and more. (Hernandez Dep. 21-28, 31; Kulpa Decl. ¶¶ 5, 7-8, 14, 21; Griffin Dep. 52).

68. Plaintiff's entry: "Gas Troubleshooters were dispatched alone to emergencies unless the job was known to include lifting in excess of 50 pounds or other unusually difficult activity, or the area in which the job site was located was unsafe. Most of the Bronx required Gas Troubleshooters to dispatch in pairs due to the latter security concern. Gas Troubleshooters always dispatched in pairs after dusk, including the majority of the midshift (3:00 pm to 12:00 am) and all of the night shift (11:00 pm to 9:00 am). (Kulpa Decl. ¶ 11; Pl. Ex. 19, Hernandez Dep. 65-66; Pl. Affirm. ¶ 6)."

<u>Defendant's response</u>: Admitted in part and denied in part. Nothing in the record supports Plaintiff's statements that: "Most of the Bronx required Gas Troubleshooters to dispatch in pairs due to the latter security concern. Gas Troubleshooters always dispatched in pairs after dusk, including the majority of the midshift (3:00 pm to 12:00 am) and all of the night shift (11:00 pm to 9:00 am)." To the contrary, Emergency Gas Troubleshooters worked alone "most of the time" (Hernandez Dep. 31). (*See also* Kulpa Decl. ¶ 11).

69. Plaintiff's entry: "However, an Emergency Gas Troubleshooter could call for backup at any time if they arrived at the job site and realized the job required additional Gas Troubleshooters. For example, it was possible that a job site required one Gas Troubleshooter to monitor the meter while another Gas Troubleshooter attempted to find a gas leak. The number of Gas Troubleshooters dispatched fluctuated relative to the complexity of the gas emergency, the required physical exertion, and the level of local safety concern. (Pl. Affirm. ¶¶ 6, 7)."

3

Defendant's response: Admitted in part and denied in part. To the extent Plaintiff's statement suggests that dispatchers would somehow know – before the Troubleshooter's arrival at the site – "the complexity of the gas emergency, the required physical exertion, and the level of local safety concern," Plaintiff's statement is contradicted by the record. In fact, it was the Emergency Gas Troubleshooter's job to arrive at the site of a gas emergency, usually alone, and immediately identify the problem and what was needed to make the site safe, and mitigate the hazard. (Hernandez Dep. 21, 31; Kulpa Decl. ¶¶ 8, 11; Griffin Dep. 52; Pl. Aff. ¶¶ 7-8).

70.   Plaintiff's entry: "A typical job began with a call from the dispatcher directing Plaintiff, and his partner if one was necessary for that job, to the site of a gas emergency. Plaintiff would drive the company vehicle to the site. Upon arrival, Plaintiff would speak with the building manager or superintendent regarding the reported gas leak. Plaintiff would carry his tool bag, which included gas monitor equipment, roughly 5 pounds, approximately 3 hand wrenches, roughly 2.5 pounds each, spare valves, a water bottle, and rags, totaling roughly 15 to 30 pounds, into the building. Then, Plaintiff would turn off the gas to the building by hand or with a wrench to stop the leak. Plaintiff would then try to identify the site of the gas leak; most often, stemming from the gas connection in the basement of the building or the gas lines underneath the building, which would have to be accessed below ground. If the latter, Plaintiff would open the manhole cover leading to the gas lines. ConEd supplied a prior bar, an apparatus that assisted in opening and shifting manhole covers, which Plaintiff would use to effectively disperse the weight of a 20 to 50 pound manhole cover. ConEd policy required two individuals to move manhole covers weighing above 50 pounds. (Pl. Ex. 19, Hernandez Dep. 65-66; Pl. Affirm. ¶¶ 4, 8)."

Defendant's response: Admitted in part and denied in part. It is inaccurate to suggest that there was a "typical job." To the contrary, Emergency Gas Troubleshooters were required to

4

handle any and all types of gas emergencies – all of which presented potentially deadly hazards, and which could lead to fatal consequences if not handled correctly or if the Troubleshooter was unable to handle the physical demands of the job. (Kulpa Decl. ¶¶ 5, 7-9, 14-16, 20 & Exh. A; Hernandez Dep. 21-28, 31; Limmiatis Decl. ¶ 11 & Exh. 3, pgs. i-ii, 31-33; Pl. Aff. ¶ 8).

71. Plaintiff's entry: "When Plaintiff was not conducting emergency response work, he was performing routine gas inspections that did not require any lifting or installing gas meters. Plaintiff typically worked with AC250 gas meters, which weigh from 10 to 20 pounds. The only other meter Plaintiff ever installed was an AC5000, which weighed over 100 pounds. Plaintiff, nor any other Gas Troubleshooter to Plaintiff's knowledge, never lifted an AC5000 alone and had the assistance of multiple other individuals to lift and install the meter. (Kulpa ¶ 5; Pl. Ex. 19, Hernandez Dep. 36, 65-66; Pl. Affirm. ¶ 14)."

Defendant's response: Admitted in part and denied in part. All Gas Troubleshooters were required to lift, push, pull, and carry objects weighing up to 50 pounds and more on a regular basis. The meter work required each Gas Troubleshooter to be able to lift and carry up to 50 pounds and more on his own. (Kulpa Decl. ¶¶ 7-14, 23; Hernandez Dep. 22-27, 83-87; Fox Decl. ¶¶ 2-4).

72. Plaintiff's entry: "On an average day, Plaintiff would complete two to six emergency response jobs. On days when there were very few gas emergencies, Plaintiff would spend the entire day conducting gas inspections, which required no lifting except the 15 to 30 pound toolbag. (Pl. Affirm. ¶ 14)."

Defendant's response: Admitted in part and denied in part. Plaintiff's job as a Gas Troubleshooter required him to be able to perform gas emergency work, gas inspections, and

5

meter work as needed, and required him to be able to lift, push, pull, and carry objects weighing up to 50 pounds and more on a regular basis. (Kulpa Decl. ¶¶ 7-14, 20; Hernandez Dep. 22-28).

73. Plaintiff's entry: "Paperwork varied by job complexity. For an inside leak, such as a stove leak, paperwork might take an hour. For an outside leak only affecting one building, paperwork might take an hour and a half. For an outside leak affecting multiple buildings or an entire block, paperwork might take two hours. (Pl. Affirm. ¶ 15)."

Defendant's response: Admitted in part, and aver that however long it "might take" to complete paperwork is utterly irrelevant to anything of consequence in this case, and further aver that however long Plaintiff attests that it "might take" has no bearing on how long it should take.

74. Plaintiff's entry: "At all times while employed as an Emergency Gas Troubleshooter, Plaintiff could, and on many occasions did, ask another Gas Troubleshooter or the building manager or superintendent for assistance lifting heavy items. (Pl. Affirm. ¶ 12)."

Defendant's response: Admitted in part and denied in part. That Plaintiff may have "on many occasions" asked for assistance lifting heavy items has no bearing on the fact that his job required him to be able to lift, push, pull, and carry objects weighing up to 50 pounds and more on a regular basis. (Kulpa Decl. ¶¶ 7-14, 20; Hernandez Dep. 21-28, 31).

75. Plaintiff's entry: "All Gas Troubleshooters were required to pass an operator qualification exam. Those Gas Troubleshooters that failed their operator qualification exam would assist other Gas Troubleshooters by accompanying them to jobs, driving, and performing other light duties in the yard. (Pl. Affirm. ¶ 5)."

Defendant's response: Admitted in part and denied in part. Gas Troubleshooters who failed an exam module would be permitted to take the module again, and would not be permitted to perform the particular covered task that was the subject of the failed exam module until they

eventually passed that exam module. However, all Gas Troubleshooters were required to maintain their operator qualification. Any Gas Troubleshooter with lifting restrictions that prevented them from ever taking their renewal exams and regaining their operator qualification, such as Plaintiff, were legally disqualified from working as a Gas Troubleshooter. And unlike Plaintiff, Donnie Fox maintained his operator qualification at all relevant times. (Kulpa Decl. ¶¶ 4, 21-22, 25).

76.     Plaintiff's entry: "On September 9, 2020, whilst on the way to a job site, Plaintiff was seriously injured in a motor vehicle accident. Plaintiff's entire lateral side was slammed against the rigid car frame, resulting in a disability in Plaintiff's left knee. Two ConEd supervisors, Christopher Bender and Tommy Comito, attended the location of the accident. Plaintiff informed Mr. Comito of injuries he sustained due to the vehicle accident. (Def. Ex. B (Windows Media Player video); Pl. Ex. 17, Pl. Dep 89-91; Pl. Affirm. ¶ 16)."

Defendant's response: Admitted in part and denied in part. On September 9, 2020, Plaintiff did not report any injury to Con Edison or to the police. In fact, that day, after the accident, Mr. Burke finished his regular work shift and worked three and one-half hours of overtime that evening. (Kulpa Decl. ¶ 17 & Exh. B (Windows Media Player video), Exh. C).

77.     Plaintiff's entry: "On September 11, 2020, Plaintiff was at home on a scheduled day off work, and suddenly experienced excruciating pain and the feeling of internal bleeding inside his chest. Plaintiff was admitted into the Intensive Care Unit of Mount Sinai Hospital, where doctors conducted an initial physical examination. Plaintiff reported left hand, left knee, and left arm injuries to the doctors. However, as a result of his severe chest pain, doctors conducted an X-ray, diagnosing Plaintiff with an aortic aneurysm and descending aortic dissection requiring emergency open-heart surgery. Doctors additionally identified the injury to

7

Plaintiff's left knee while physically examining Plaintiff related to his heart emergency. (Pl. Affirm. ¶ 17)."

Defendant's response: Admitted in part and denied in part. Nothing in the record supports Plaintiff's statement that "Doctors additionally identified the injury to Plaintiff's left knee while physically examining Plaintiff related to his heart emergency." (*See* Pl. Aff. ¶¶ 17-18).

78.   Plaintiff's entry: "After the surgery, Plaintiff informed ConEd Planner Kevin Moore of his medical complications and Mr. Moore instructed Plaintiff to use his earned sick leave. (Pl. Ex. 17, Pl. Dep 89; Pl. Affirm. ¶ 18)."

Defendant's response: Admitted.

79.   Plaintiff's entry: "On September 25, 2020, the Workers Compensation Board notified Plaintiff he "suffered an on-the-job injury or illness" to his "whole body" (case #G2857639). (Pl. Ex. 9)."

Defendant's response: Denied. The cited document does not say that Plaintiff "suffered an on-the-job injury or illness" to his "whole body." Rather, it says, in relevant part: "The Workers' Compensation Board was notified that you suffered an on-the-job injury or job-related illness." In other words, the Workers' Compensation Board was simply characterizing the nature of Plaintiff's claim. The words "Whole Body" are set forth under the caption listing Plaintiff as the Claimant. The date of the notice is September 28, 2020, and the designated case number is G2857369. (Pl. Exh. 9, Dkt. 60, pg. 85 of 669).

80.   Plaintiff's entry: "On March 15, 2021, the Workers Compensation Board found in favor of ConEd regarding the disputed validation of Plaintiff's hospitalization and open-heart surgery medical treatment. The Workers Compensation Board affirmed ConEd's claim that only the injury to Plaintiff's left knee was a workplace injury. (Pl. Ex. 10)."

8

Defendant's response: Admitted in part and denied in part. The cited document constitutes a "Notice of Proposed Conciliation Decision," and does not characterize itself as finding "in favor of ConEd regarding the disputed validation of Plaintiff's hospitalization and open-heart surgery medical treatment." (Pl. Exh. 10, Dkt. 60, pg. 87 of 669).

81. Plaintiff's entry: "On April 9, 2021, Metropolitan Life Insurance Company (hereinafter, MetLife) notified Plaintiff that it approved his long-term disability claim effective April 15, 2021. (Pl. Ex. 1)."

Defendant's response: Admitted.

82. Plaintiff's entry: "In May 2021, MetLife notified Plaintiff of various requirements and requests related to the continuation of his group life insurance that ultimately resulted in an Independent Medical Examination and Vocational Assessment. On May 11, 2021, Plaintiff Burke received a letter from MetLife acknowledging receipt for the Continuation of Group Life Disability Operations. On May 12, 2021, Plaintiff received a letter from MetLife's Group Life Waiver Unit requesting more information regarding Plaintiff's Continuation of Group Life Insurance. On May 20, 2021, Dr. Ronald Mann, MD, performed an Independent Medical Examination and Vocational Employment Assessment on Plaintiff on behalf of MetLife. (Pl. Ex. 7)."

Defendant's response: Admitted in part and denied in part. Dr. Mann did not perform a "Vocational Employment Assessment on Plaintiff." The document filed by Plaintiff as page 79 of 669 (Dkt. 60) and included as part of Exhibit 7 to Plaintiff's Affirmation was not part of Dr. Mann's report, but rather, was part of an entirely separate, 3-page report dated July 7, 2021, from Genex. (Pl. Exh. 7, Dkt. 60, pgs. 75-79 of 669; *see* Defendant's Exhibit Q attached to the Reply Declaration of Paul Limmiatis ("Limmiatis Reply Decl.")).

83. Plaintiff's entry: "On July 14, 2021, MetLife informed Plaintiff of the results of the Independent Medical Examination and Vocational Assessment. MetLife stated that, "After careful review, including information submitted in the Long-Term Disability claim, it was determined that Mr. Burke does not support impairment preventing the ability to return to work in an alternate less physical capacity." The letter stated that the Vocational Employment Assessment conducted by Dr. Mann concluded that Plaintiff had only a 25% mild disability in his left knee, and, based on his education, training, and work experience, Plaintiff could be employed by ConEd, as any of the following:

a. Repair Order Clerk, (dot code 221 382-022),

b. Deliverer Outside (dot code 230 663-010),

c. or Assembler Production (dot code 706 687-010).

As a result, MetLife terminated Plaintiff's long-term disability payments. (Pl. Ex. 17, Pl. Dep 110-112, 135-144; Pl. Ex. 7 pp. 6-9 (CE-003548-CE-003550, CE-003585); Pl. Ex. 11)."

Defendant's response: Denied. Plaintiff's entry misquotes and misrepresents the content and effect of the notice from Met Life dated July 14, 2021, a true and correct copy of which is attached as Defendant's Exhibit N to the Limmiatis Reply Declaration. Moreover, Plaintiff's statement that "[a]s a result, MetLife terminated Plaintiff's long-term disability payments," constitutes a blatant and intentional misrepresentation of the facts, and more specifically, directly contradicts the undisputed fact that Met Life paid long-term disability benefits to Plaintiff for 24 consecutive months beginning April 2021 and ending April 2023. In fact, the Met Life notice concerns Plaintiff's claim for continuation of life insurance benefits, not his claim for long-term disability benefits. Additionally, the Met Life notice does not refer to a "Vocational Employment

10

Assessment conducted by Dr. Mann," nor does it in any way suggest that the three identified "occupations" were jobs that existed at Con Edison. (Limmiatis Reply Decl. ¶ 3, Def. Exh. N; Plaintiff's Response to Defendant's Local Rule 56.1 Statement ("Pl. 56.1 Resp.") ¶ 38).

84.    Plaintiff's entry: "Plaintiff followed the instructions contained in the aforementioned March 15, 2021, letter from ConEd to Plaintiff regarding his ultimate return to work exactly as the letter reads. Upon realizing that his allotted one year of medical leave would expire September 9, 2021, Plaintiff contacted ConEd to schedule a return to work medical examination with the Employee Wellness Center (EWC). (Def. Ex. J; Pl. Ex. 17, Pl. Dep 100-105)."

Defendant's response: Denied. Plaintiff did not "follow[ ] the instructions contained in the . . . March 15, 2021, letter from ConEd to Plaintiff regarding his ultimate return to work exactly as the letter reads," nor did he "contact[ ] ConEd to schedule a return to work medical examination with the Employee Wellness Center (EWC) . . . [u]pon realizing that his allotted one year of medical leave would expire September 9, 2021." Plaintiff knew in March 2021 that his medical leave would expire on September 9, 2021, but waited until late August 2021 to contact Con Edison to schedule a return-to-work medical exam. (Pl. 56.1 Resp. ¶ 40; Def. Exh. J).

85.    Plaintiff's entry: "On September 7, 2021, Dr. Gabriel DiLuozzo, MD, issued Plaintiff a letter that stated in part that Plaintiff underwent open heart surgery and after an uneventful post-operation recovery, Plaintiff was "medically cleared to return to work" on September 8, 2021 with the limitation that Mr. Burke was not to lift more than 25 pounds. Plaintiff faxed this letter to the EWC in preparation for his return to work medical examination on September 9, 2021. ConEd informed Plaintiff that the letter was insufficient because it did not explicitly clear Plaintiff to drive. Dr. DiLuozzo issued another letter, with the same language as

11

the first but explicitly clearing Plaintiff to drive. In neither letter did Dr. DiLuozzo apply permanent restrictions or a permanent disability. (Complaint Ex. A; Pl. Ex. 17, Pl. Dep 145-147; Pl. Ex. 2)."

Defendant's response: Admitted in part and denied in part. Neither letter from Dr. Di Luozzo characterizes Plaintiff's lifting restriction as temporary or permanent, and it is undisputed that Plaintiff's lifting restrictions were never removed and that Con Edison reasonably and justifiably considered the restrictions to be permanent or long-term in nature and Plaintiff never provided Con Edison with any basis to suggest otherwise. Additionally, Plaintiff himself characterizes his condition as a "permanent disability." (Complaint Ex. A; Pl. Exh. 2; Pl. 56.1 Resp. ¶¶ 44, 58; Frankel Dep. 72).

86. Plaintiff's entry: "On September 9, 2021, Plaintiff was examined by Dr. Jose Jeune, MD at the EWC. Dr. Jeune informed Plaintiff he was approved as medically capable of returning to work. After being approved, Plaintiff followed the instructions from the March 15, 2021, letter by immediately notifying his supervisor Mr. Moore and Human Resources Project Specialist Patricia Whelton. Mr. Moore instructed Mr. Burke to report for light duties the following day, September 10, 2021, at 7:00 am. (Pl. Ex. 17, Pl. Dep 152, 159, 180, Jeune Affirm. ¶ 5; Pl. Affirm. ¶¶ 20, 21)."

Defendant's response: Admitted in part and denied in part. It is undisputed that Dr. Jeune erred in initially clearing Plaintiff to return to work with restrictions. (Pl. 56.1 Resp. ¶¶ 44-45).

87. Plaintiff's entry: "Later that same day, Dr. Jeune called Plaintiff and contradicted his earlier statements and Mr. Moore's instructions, telling Plaintiff that not [sic] to return to work on September 10, 2021. When Plaintiff asked why, Dr. Jeune did not provide any reason or explanation as to why Plaintiff's approval to return to work had been rescinded. Dr. Jeune did not

12

tell Plaintiff that he failed the physical examination, that Dr. Jeune had made a mistake, that Dr. Jeune's coding error would result in an administrative termination or any change of status, or that Plaintiff was unable to perform the essential functions of his job. (Pl. Ex. 17, Pl. Dep 160-161, Jeune Affirm. ¶ 6; Pl. Affirm. ¶ 22)."

Defendant's response: Admitted in part and denied in part. In the telephone conversation between Dr. Jeune and Plaintiff on September 9, 2021, Dr. Jeane told Plaintiff that he was not cleared to return to work, but was coded as "not fit for duty." Dr. Jeane also advised Plaintiff to submit updated medical documentation to EWC in the event that his medical condition improved to the point of allowing him to handle more than 20-25 pounds. However, Plaintiff never submitted any updated medical documentation to EWC. (Jeune Decl. ¶ 6; Pl. 56.1 Resp. ¶ 58).

88.     Plaintiff's entry: "After the call with Dr. Jeune, Plaintiff called Mr. Moore to update him. Mr. Moore was confused and checked Plaintiff's status in ConEd's internal system, finding and informing Plaintiff that his status was marked terminated. Mr. Moore told Plaintiff that something was wrong and he should call his Union representative. (Pl. Dep 161-162; Pl. Affirm. ¶ 21)."

Defendant's response: Admitted.

89.     Plaintiff's entry: "Plaintiff contacted Union Representative Joel Pacheco and notified Mr. Pacheco of his termination by Dr. Jeune. Mr. Pacheco contacted Union Business Agent Robert Griffin. (Pl. Ex. 17, Pl. Dep 162, 166; Pl. Affirm. ¶ 21)."

Defendant's response: Admitted in part and denied in part. Nothing in the record supports Plaintiff's false assertion that his employment was "terminat[ed] by Dr. Jeune."

90.     Plaintiff's entry: "On September 16, 2021, Mr. Griffin reached out to ConEd management asking for clarification as to why Plaintiff was terminated rather than assigned to

light duties until his restrictions could be reassessed from 'temporary' to 'permanent,' or the company C-6 Program, designed specifically for those with 'permanent' restrictions. Mr. Griffin spoke with Patricia Whelton, who, according to Mr. Griffin's sworn testimony, indicated in response to his questions that "she didn't know herself and she was trying to piece it together." (Pl. Ex. 18, Griffin Dep. 8-9; Pl. Ex. 4 (CE-000741])."

Defendant's response: Admitted.

91.     Plaintiff's entry: "On September 17, 2021, Plaintiff submitted a Union grievance. (Pl. Ex. 12)."

Defendant's response: Admitted.

92.     Plaintiff's entry: "ConEd did not engage in any interactive process with Plaintiff. ConEd never communicated to Plaintiff that his case would proceed to the Accommodations Review Committee (ARC) nor explained the ARC process, despite having multiple guides intended to educate personnel on the ConEd policy and practices for requests for accommodation and limited duty placement for long-term medical restrictions among unionized members. ConEd did not advise Mr. Griffin that Plaintiff's case would be discussed at the ARC. To Plaintiff's knowledge, ConEd contested to Mr. Griffin that Plaintiff had been "terminated." (Pl. Ex. 17, Pl. Dep. 188-189, Pl. Ex. 3, pp. 2-9; Pl. Ex. 18, Griffin Dep. 13-15])."

Defendant's response: Denied. Con Edison's policies and procedures on reasonable accommodations for employees with disabilities are available to all employees, but Plaintiff made no effort to inform himself of these policies and procedures, nor did he bother to ask anyone at Con Edison about the process for requesting an accommodation of his disability – despite having been on medical leave for all of one year. Moreover, Con Edison did advise Griffin that Plaintiff's case would be discussed at the ARC meeting in September 2021. And Con

14

Edison did engage in an interactive process with Plaintiff. Additionally, Plaintiff's assertion, that "ConEd did not engage in any interactive process with Plaintiff," to the extent it constitutes legal argument rather than a factual statement, should not be considered by the Court. (Frankel Dep. 23, 51-52; Pl. Dep. 124-25; Pl. 56.1 Resp. ¶¶ 42-44, 47, 50, 54-58).

93. Plaintiff's entry: "On September 24, 2021, after the ARC meeting on September 23, 2021, ConEd finally admitted to Mr. Griffin that Plaintiff had been terminated. Mr. Griffin relayed this information to Plaintiff and requested a formal release letter. Patricia Whelton failed to respond to Mr. Griffin's request, leading Mr. Griffin to reach out to ConEd Director of Labor Relations Vincent Frankel. Mr. Frankel advised Ms. Whelton that ConEd had failed to adequately inform Plaintiff of ConEd's processes through communication thus far, stating that "This process needs to be improved. The letter he got speaks to Occupational Health and does not define the return to work with clear language about 'able to perform the essential functions of your job with or without reasonable accommodation.'" Furthermore, Mr. Frankel instructed Ms. Whelton that "5 months after the expiration of sick at end of [leave of absence], we don't communicate status," confirming that ConEd would maintain its tactic of strategically keeping Plaintiff in the dark, a practice anthetical [sic] to any interactive process (Pl. Ex. 5 (p. 1 (CE-000746)))."

Defendant's response: Admitted in part and denied in part. Nothing in the record supports Plaintiff's assertion that Con Edison was engaged in a "tactic of strategically keeping Plaintiff in the dark." Additionally, Mr. Frankel's email comment, "5 months after the expiration of sick at end of [leave of absence], we don't communicate status," was not an instruction to Ms. Whelton; it was a characterization of the previous five months, and the theretofore lack of communication between Con Edison and Plaintiff regarding his status. Moreover, Plaintiff's assertions in that

15

regard constitute argument, not factual statements, and should not be considered by the Court. (Pl. Exh. 5, Dkt. 60, pg. 46 of 669).

94.     Plaintiff's entry: "ConEd never informed Plaintiff or the Union that its actions constituted a mistake, an administrative termination, a clerical mistake, or a coding error, despite multiple human resources employees flagging to ConEd management that Plaintiff's status should be reversed in order to compensate for their mistake. On September 16, 2021, Wendy Trepiccione emailed Human Resources Project Specialist Patricia Whelton, "This whole case is a mess! They should not have terminated him if he was going to ARC ..." Ms. Whelton responded by asking Ms. Trepiccione "Should HRSC be advised to delete the termination & continue him on [Leave of Absence] at least until the ARC?" Ms. Trepiccione then posed this question to Mr. Frankel in a different email, asking "Should we have the termination deleted and continue him on the [Leave of Absence] until outcome of the ARC?" Mr. Frankel failed to respond (Pl. Ex. 18, Griffin Dep. 48; Pl. Ex. 4 (CE-000741); Pl. Ex. 6 (CE-000762))."

Defendant's response: Admitted in part and denied in part. As Vincent Frankel explained in his deposition, there was no reason to reclassify Plaintiff's status in mid-September 2021, pending consideration of Plaintiff's case by the ARC, because Plaintiff had been in "no pay" and "no benefits" status for five months before September 9, 2021, and remained in "no pay" and "no benefits" status after September 9, 2021. Had Plaintiff accepted Con Edison's offer to test for the clerical positions, and had he passed the tests for one of those positions, he would have been reinstated to the payroll and the "termination" deleted from the system. In other words, from an administrative standpoint, his status would have been as if he had never left the Company. (Frankel Dep. 46-50, 53-59, 98-99, 104-05).

95. Plaintiff's entry: "On April 11, 2022, having received no arbitration hearing date for his Union grievance, seen no results of Union interactions with ConEd, and received a right to sue letter from the Equal Employment Opportunity Commission, Plaintiff contacted Mr. Griffin to withdrawal [sic] his Union grievance. (Pl. Ex. 17, Pl. Dep 193-197)."

Defendant's response: Admitted in part and denied in part. Plaintiff's arbitration hearing was scheduled to begin on April 21, 2022, and the Union would have been well aware, weeks beforehand, of this hearing date. (Frankel Decl. ¶ 15).

96. Plaintiff's entry: "On March 15, 2023, Plaintiff's long-term disability payments were terminated. The 24 months provided by the MetLife Group Plan had expired, and in order to continue disbursal, Plaintiff must submit evidence that his disability had qualified him for Social Security Disability benefits. Plaintiff did not qualify for Social Security Disability benefits because his heart had recovered and his knee was merely a 25% mild disability. Ironically, the very reasons why Plaintiff was medically qualified to return to work at ConEd were the same reasons why Plaintiff could not continue receiving the only income available to him after his wrongful termination. (Pl. Ex. 13)."

Defendant's response: Denied. Plaintiff's long-term disability benefit payments ended in April 2023. He was denied Social Security Disability benefits because, according to the Social Security Administration, he had not worked in the United States for "long enough under Social Security." Additionally, Plaintiff's characterization of the termination of his employment as a "wrongful termination" constitutes legal argument, not a factual statement, and therefore, should not be considered by the Court. (Pl. 56.1 Resp. ¶ 38; Limmiatis Reply Decl. ¶ 4 & Exh. 1).

97. Plaintiff's entry: "On May 4, 2023, Plaintiff received a letter from the New York State Department of Labor informing him that his unemployment benefits application was denied

17

due to information the Department of Labor had received indicating that Mr. Burke had voluntary quit his job at Con Ed September 9, 2021. The March 15, 2021, letter that ConEd had forcefully maintained to Mr. Griffin was sufficient to act as a release letter was deemed insufficient by the Department of Labor. According to ConEd, that letter constituted release, but according to the Department of Labor, that letter constituted a notice of possible release. (Pl. Ex. 14)."

Defendant's response: Denied. The cited letter from the New York State Department of Labor does not state that Plaintiff's "unemployment benefits application was denied due to information the Department of Labor had received indicating that Mr. Burke had voluntary quit his job at Con Ed September 9, 2021." Rather, the letter requested "information from [Plaintiff] so we may decide your eligibility for Unemployment Insurance benefits." Nor does the letter say anything about the March 15, 2021 letter being "insufficient" as a "release letter." (Pl. Exh. 14).

98.     Plaintiff's entry: "Plaintiff has been treated for severe depression since 2023. (Pl. Ex. 15)."

Defendant's response: Denied. The cited document does not state that Plaintiff has been treated for severe depression since 2023. Rather, the letter, dated March 4, 2025, does not place a date as to when Plaintiff's treatment began. (Pl. Exh. 15).

Dated: May 28, 2025
       New York, New York

CHRISTOPHER A. D'ANGELO
Attorney for Defendant Consolidated Edison
Company of New York, Inc.

Of Counsel:

By: /s/ Paul Limmiatis
    4 Irving Place, 18th Floor
    New York, New York 10003
    limmiatisp@coned.com
    914-837-5456