UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TREVOR BURKE,<br><br>                              Plaintiff,<br><br>                    v.<br><br>CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.,<br><br>                              Defendant. | 23 Civ. 2111 (DEH)<br><br>**OPINION<br>AND ORDER** |

DALE E. HO, United States District Judge:

Plaintiff Trevor Burke brings this action against his former employer, Consolidated Edison Company of New York, Inc. ("Con Edison" or "Defendant"), alleging discrimination based on disability under the Americans with Disabilities Act ("ADA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), and based on race and color under Title VII of the Civil Rights Act of 1964 ("Title VII"), the NYSHRL, and the NYCHRL. The Court understands Burke to be raising two alternative ADA claims: (1) a discrimination claim based on Con Edison's termination of his employment as a Gas Troubleshooter after he suffered injuries limiting his ability to lift heavy objects; and (2) a failure-to-accommodate claim based on Con Edison's failure to place him in a clerical position that would have accommodated his disability.

Before the Court is Defendant's motion for summary judgment on all claims. For the reasons given below, Defendant's motion is **GRANTED IN PART and DENIED IN PART**. Specifically, Burke's ADA claim for discrimination based on his termination from the Gas Troubleshooter position is dismissed, because the undisputed evidence demonstrates that Burke was not qualified to perform the essential functions of that position, with or without

accommodation. However, Burke's ADA claim for failure to accommodate is *not* dismissed and may proceed to trial, because there are issues of fact as to whether Con Edison satisfied its obligation to engage in an interactive process with Burke to assess whether his disability could be reasonably accommodated in a clerical position. Similarly, Burke's claims under the NYSHRL and NYCHRL based on the failure to reinstate him to his prior position are dismissed, but his claims based on failure to accommodate him in a clerical position may proceed. Burke's claims for race and color discrimination are dismissed because he has presented no evidence that the treatment that he received was because of his race or color, such as evidence that similarly situated co-workers of a different race were treated more favorably than he was.

## BACKGROUND

### A. Factual Background[1]

Burke was hired by Con Edison in 2014 as a Mechanic B in Gas Operations, Bronx Gas Distribution Services ("Bronx GDS"). Def.'s Loc. Civ. R. 56.1 Statement of Material Facts ("Def. SOF") ¶ 1, ECF No. 42. A Mechanic B was "considered to be 'in training' until promoted to Mechanic A," which required passing a series of practical exams involving various gas emergency tasks ("covered tasks") in order to become "operator qualified." Def. SOF ¶¶ 8-9. Burke

---

[1] The following facts are drawn from the parties' submissions in support of and in opposition to the motion for summary judgment, including Con Edison's Local Rule 56.1 Statement of Material Facts ("Def. SOF"), ECF No. 42; Burke's Response to Con Edison's Local Rule 56.1 Statement and Further Statement of Material Facts ("Pl. SOF"), ECF No. 59; and Con Edison's Local Rule 56.1 Reply to Plaintiff's Further Statement of Material Facts ("Def. SOF Reply"), ECF No. 63; as well as the affidavits, deposition testimony, and other exhibits attached to the motion papers. Citations to a party's Local Rule 56.1 statement incorporate by reference the documents cited therein. The facts recounted below are undisputed except where otherwise noted. Where a party purports to dispute the opposing party's statement of material fact but does not cite to admissible evidence controverting the statement, the Court will treat the statement as undisputed. *See* Loc. Civ. R. 56.1(d).

completed his operator qualification exams and was promoted to Mechanic A in 2018. Def. SOF ¶ 10. The "Mechanic A" job title was later changed to "Gas Troubleshooter," but the job's functions and requirements did not change. Def. SOF ¶ 11.

The work of a Gas Troubleshooter generally falls into one of three categories: (1) emergency gas work; (2) meter work; and (3) routine inspections. Def. SOF ¶ 13. Like most Gas Troubleshooters, Burke's primary work function was emergency gas work—i.e., he was an Emergency Gas Troubleshooter. Def. SOF ¶¶ 14, 19. Emergency gas work involves responding to gas leaks and other gas emergencies, investigating the situation, and, if a gas leak is found, making the situation safe. Def. SOF ¶ 4; Pl.'s Resp. to Def.'s Loc. Civ. R. 56.1 Statement of Material Facts ("Pl. SOF") ¶ 67, ECF No. 59. Emergency Gas Troubleshooters usually worked alone, though they would pair up under certain circumstances. Def. SOF ¶ 15; Pl. SOF ¶ 15. When not responding to gas emergencies, Emergency Gas Troubleshooters would conduct routine inspections. Def. SOF ¶ 14. The few Gas Troubleshooters whose primary work entailed something other than emergency gas work were assigned to meter work, which mostly involved delivering, installing, and replacing gas meters. Def. SOF ¶¶ 14, 16. Large meter work—i.e., work on meters weighing 50 to 100 pounds and more—required a two-person crew. Def. SOF ¶¶ 17, 62.

Burke's job as a Gas Troubleshooter required physically demanding, heavy manual labor, including lifting and carrying objects weighing up to 50 pounds and more; tightening, loosening, turning, and twisting valves and pipes with a wrench, which required significant torque strength and physical exertion; and pulling and pushing other objects weighing up to 50 pounds and more. Def. SOF ¶ 12. Before Burke was hired, Con Edison required him to pass a physical abilities test that included lifting a 50-pound bag of sand. Def. SOF ¶ 2. At the time he was hired, Burke

understood that the job would require him to be able to lift objects weighing up to 50 pounds.  Def. SOF ¶ 3.

During the relevant period, Con Edison Gas Troubleshooters were required by law to renew their "operator qualified" status every three years by taking practical exam modules that required strenuous and demanding physical tasks, including lifting, pushing, pulling, and carrying objects weighing more than 25 pounds.  Def. SOF ¶ 59.  Gas Troubleshooters who failed part of the operator qualification exams were placed on temporary light duties until they could take and pass the failed exam module.  Pl. SOF ¶¶ 59, 75; Def. SOF Reply ¶ 75.  Burke's operator qualification, obtained in February 2018, was set to expire (and did expire) in February 2021.  Def. SOF ¶ 60.

On September 9, 2020, Burke was involved in a motor vehicle accident while working for Con Edison.  Def. SOF ¶ 20.  He did not request medical attention immediately afterward.  Def. SOF ¶ 21.  Although the police report indicates that there were no injuries, Burke sustained an injury to his left knee.  Def. SOF ¶¶ 21, 27.

Burke was scheduled to be off for the rest of the week and return to work on September 15, 2020.  Def. SOF ¶ 23.  However, on September 11, 2020, he began experiencing excruciating pain in his chest and was admitted to the cardiac intensive care unit at Mount Sinai Hospital, where he was diagnosed with an aortic aneurysm and descending aortic dissection.  Def. SOF ¶ 24-25; Pl. SOF ¶ 77.  The last day Burke physically reported for work with Con Edison was the day of the accident, September 9, 2020.  Def. SOF ¶ 22.

Burke was out on paid sick leave from September 14, 2020 to April 14, 2021.  Def. SOF ¶ 29.  In March 2021, he received a letter from Con Edison explaining that his paid sick leave would expire on April 14, 2021.  Def. SOF ¶ 32.  A follow-up letter that month explained that because his absence was due to an occupational injury, pursuant to the collectively bargained contract, he

would be in "leave no pay" status through September 9, 2021, unless he was able to return to work before that date.  Def. SOF ¶ 33.  The letter advised him to schedule a medical appointment with Con Edison's occupational health department if he was able to return to work before September 9.  Def. SOF ¶ 33.  On March 15, 2021, Con Edison's payroll system was updated to account for Burke's "leave no pay" status until September 9, 2021.  Def. SOF ¶ 34.  Because of how the system was designed, the employment status of an employee in "leave no pay" status would show as "terminated" as of the last day of the "leave no pay" period, unless the system entries were manually overridden upon the employee's return to work on or before that date.  Def. SOF ¶ 34.

On or about March 30, 2021, Burke applied for long-term disability ("LTD") benefits under Con Edison's LTD Plan.  Def. SOF ¶ 35.  In the application form, under "Please describe what prevents you from performing the duties of your job," Burke wrote: "Recovering [from] operation (unable to lift heavy load)."  Def. SOF ¶ 35.  To be eligible for benefits under the LTD Plan, an employee must be "totally and permanently disabled," meaning he was "unable to perform the duties of [his] job."  Def. SOF ¶ 36.  Burke was approved for LTD and received monthly benefits for the next two years, from April 2021 to April 2023.  Def. SOF ¶¶ 37-38.

In late August 2021, Burke contacted his supervisor, Kevin Moore, to schedule a return-to-work medical exam, which was scheduled for September 9, 2021.  Def. SOF ¶ 40.  Burke brought with him to the exam a note dated September 7, 2021, from his physician, Gabriele Di Luozzo, M.D., stating, in part: "We are medically clearing him to return to work as of September 8, 2021 with limitations; his medical condition does not allow him to lift over 25lbs.; I am requesting that he may be accommodated accordingly."  Def. SOF¶ 44.  The return-to-work exam was conducted by Con Edison Staff Physician Jose Jeune, M.D., who found that Burke's blood pressure was very high and not well-controlled, indicating that his lifting restriction would likely remain in effect for

an indeterminate period of time.  Def. SOF ¶ 44.  Dr. Jeune imposed a medical restriction, "Pushing, pulling or lifting up to 20 pounds not to exceed 3 to 6 hours per day," indicating that Burke should not push, pull, or lift more than 20 pounds at any time.  Def. SOF ¶ 44.  But due to Dr. Jeune's mistaken belief that Burke had already been cleared to return to work, this restriction was erroneously coded as "temporary," and Burke's status was erroneously coded as "continued on duty with restrictions."  Def. SOF ¶ 44.  Dr. Jeune informed Burke that he was cleared to return to work, and Burke immediately notified Moore, who told him to report to work for light duties the next day.  Pl. SOF ¶ 86.

Later that day, Con Edison's Medical Director, Stephanie Barnhart, M.D., caught the errors in the system and instructed Dr. Jeune to call Burke and inform him that he was not cleared to return to work.  Def. SOF ¶ 45.  Dr. Jeune did so later that afternoon.  Def. SOF ¶ 45.  Dr. Jeune stated that Burke should not return to work on September 10, 2021, without providing further explanation, and advised Burke that he should submit updated medical documentation if his condition improved.  Def. SOF ¶ 45; Pl. SOF ¶ 87.  Dr. Barnhart never followed up with Dr. Jeune to ensure that all the relevant information had been conveyed.  Pl. SOF ¶45.

After the call with Dr. Jeune, Burke called Moore, his supervisor, to update him.  Pl. SOF ¶ 88.  Moore was confused and checked Burke's status in Con Edison's internal system, finding and informing Burke that his status was marked as "terminated."  Pl. SOF ¶ 88.  Moore told Burke that something was wrong and he should call his union representative.  Pl. SOF ¶ 88.  Burke then called Union Representative Joel Pacheco, who contacted Union Business Agent Robert Griffin.  Pl. SOF ¶ 89.

In the afternoon of September 9, 2021, Human Resources Manager Wendy Trepiccione informed Burke's section manager, Robert Kulpa, of Burke's medical restrictions by email and

asked whether the restrictions could be accommodated, stating that "[i]f not he would be sent to ARC [Accommodation Review Committee]." Def. SOF ¶ 46; Kulpa Decl. ¶ 20 & Ex. D, ECF Nos. 41 & 41-3. Kulpa replied: "Employee would not be able to perform functions of a GDS troubleshooter with these restrictions." Def. SOF ¶ 46; Kulpa Decl. Ex. D.

On September 10, 2021, Dr. Barnhart requested that Burke's case be added to the next available meeting of Con Edison's Accommodation Review Committee ("ARC"). Def. SOF ¶ 47. Although Dr. Barnhart stated that "the case potentially requires earlier review than the next standing meeting," Director of Employee and Labor Relations Vincent Frankel said his case could be discussed the following Thursday (i.e., September 16). Def. SOF ¶ 47. Ultimately, Burke's case was scheduled for the September 23, 2021 ARC meeting. Def. SOF ¶ 50. It does not appear that anyone from Con Edison ever informed Burke that his case would be discussed by the ARC, although Frankel asked Trepiccione to do so. Pl. SOF ¶ 47. Moreover, nobody at Con Edison did anything to manually override the pre-programmed "termination" that had been entered into the payroll system on March 15, 2021. Def. SOF ¶ 48. The system therefore reflected Burke's employment status as "terminated" on September 10, 2021, even though Con Edison was working to accommodate his medical restrictions. Def. SOF ¶ 48. The parties dispute whether Burke's status as "terminated" in the payroll system represented his actual termination from Con Edison as of September 10, 2021, or merely a clerical error. Def. SOF ¶ 48; Pl. SOF ¶ 48.

In the meantime, between September 10, 2021, and September 23, 2021, Union Business Agent Griffin was advocating for Burke to be returned to his regular job title and allowed to work temporarily in a "light duty" capacity until his medical restrictions were either removed or reclassified from "temporary" to "permanent," in which case he could be assigned to the company's "C-6 program." Def. SOF ¶ 51. The C-6 program is a benefit negotiated with the

union, under which employees with "permanent" or "long-term" medical restrictions are given six months to train, on company time and at their regular rate of pay, for a full-time clerical or administrative position that does not conflict with their medical restrictions. Def. SOF ¶ 51. In the event that Burke's medical restrictions were reclassified to "permanent," he would have been eligible for the C-6 program. Def. SOF ¶ 51. But under Con Edison's longstanding practice, returning to work in a temporary "light duty" capacity was not an option for Burke because he had exhausted his paid sick leave and had been out on "leave no pay" status for an extended period of time; rather, employees in his situation were referred to the ARC for review. Def. SOF ¶ 51.

On September 16, 2021, Griffin reached out to management asking for clarification as to why Burke was terminated rather than assigned to light duties until his restrictions could be reassessed from temporary to permanent, or assigned to the company C-6 program. Pl. SOF ¶ 90. Griffin spoke with Human Resources Project Specialist Patricia Whelton, who informed him that "she didn't know herself and she was trying to piece it together." Pl. SOF ¶ 90. It is disputed whether Con Edison informed Griffin that Burke's case would be discussed at the upcoming ARC meeting. Pl. SOF ¶ 92; Def. SOF Reply ¶ 92.

On September 17, 2021, Burke submitted a union grievance. Def. SOF ¶ 53; Pl. SOF ¶ 91. His grievance sought the remedy of reinstatement as a Gas Troubleshooter in a "restricted duty" capacity. Def. SOF ¶ 53. Burke later withdrew his grievance just days before the arbitration hearing scheduled for April 21, 2022, in order to pursue a federal case after receiving a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC"). Def. SOF ¶ 53; Pl. SOF ¶¶ 53, 95.

Burke's case was discussed at the ARC meeting on September 23, 2021, after which ARC Administrator Maha Sidhom identified three available positions that were consistent with Burke's

medical restrictions: Customer Service Representative (CSR), Clerical Assistant, and Energy Services Representative (ESR), each of which required the candidate to pass a test.  Def. SOF ¶¶ 54-55.

The day after the ARC meeting, on September 24, 2021, Griffin spoke with Whelton in HR again; this time, she confirmed that Burke had been released from his employment with Con Edison.  Pl. SOF ¶ 93.  Griffin conveyed this information to Burke and requested a formal release letter from Whelton via email.  Pl. SOF ¶ 93; Burke Decl. Ex. 5, ECF No. 60 (p. 46).[2]  When Whelton did not reply after several days and a follow-up email, Griffin emailed Frankel for assistance with his request.  Pl. SOF ¶ 93; Burke Decl. Ex. 5 (p. 47).  Frankel then forwarded the email to Whelton, asking: "Did we send any info to the employee on his status[?]," to which Whelton replied that Burke "was sent a letter back in March that if not approved for duty by 9/9, he'd be released on 9/10."  Pl. SOF ¶ 93; Burke Decl. Ex. 5 (pp. 46-47).  Frankel responded: "This process needs to be improved . . . 5 months after the expiration of sick at end of [leave of absence], we don't communicate status."  Burke SOF ¶ 93; Burke Decl. Ex. 5 (p. 46).

During this period, Con Edison never informed Burke or his union that his termination was a clerical mistake or a coding error, despite multiple human resources employees flagging to management that Burke's status should be corrected in the system.  Pl. SOF ¶ 94.  On September 16, 2021, Trepiccione emailed Whelton, "This whole case is a mess! They should not have terminated him if he was going to ARC."  Pl. SOF ¶ 94; Burke Decl. Ex. 4, ECF No. 60 (p. 40).  Whelton responded by asking Trepiccione, "Should [human resources] be advised to delete the termination & continue him on [leave of absence] at least until the ARC?"  Pl. SOF ¶ 93; Burke

---

[2] When citing to exhibits attached to the Burke Declaration, the Court refers to the page number of the PDF at ECF No. 60.

Decl. Ex. 4 (p. 40).  Trepiccione then posed this question to Frankel in a different email, asking: "Should we have the termination deleted and continue him on the [leave of absence] until outcome of the ARC?"  Pl. SOF ¶ 94.  Frankel apparently did not respond.  Pl. SOF ¶ 94.  He later explained in his deposition that there was no reason to reclassify Burke's status in mid-September 2021, pending consideration of the case by the ARC, because Burke had been in "no pay" and "no benefits" status for five months and remained in that status after September 9, 2021.  Def. SOF Reply ¶ 93; Frankel Tr. 54.  According to Frankel, had Burke accepted Con Edison's offer to test for the clerical positions, and had he passed the tests for one of those positions, he would have been reinstated to the payroll and the "termination" deleted from the system.  Frankel Tr. 98-99.

On October 7, 2021, Sidhom called Burke regarding testing for the clerical positions that had been identified at the September 23 ARC meeting.  Def. SOF ¶ 55.  Sidhom recalls that she explained to Burke that these positions were available to him if he passed the tests, explained what the CSR and Clerical Assistant tests entailed, offered to help him prepare, and explained that if he passed the tests he would be placed in a position.  Def. SOF ¶ 55; Sidhom Decl. ¶ 5.  She says that she asked Burke whether he was interested, to which he replied: "Yes, schedule me for the tests."  Def. SOF ¶ 55; Sidhom Decl. ¶ 5.  Burke disputes Sidhom's account of the conversation.  Pl. SOF ¶ 55.  He does not remember if they discussed the test substance, practice exams, or preparations, or if Sidhom told him that if he passed the test he would be rehired; the only thing he remembers about the phone call is telling Sidhom that any contact regarding his employment needed to go through the union.  Pl. SOF ¶ 55; Burke Tr. 198-201, ECF No. 43-4.  According to Griffin, "[i]t was never offered in [Burke's] case that they were willing to bring [Burke] back.  All [Con Edison] said was they were willing to test him, that's it."  Pl. SOF ¶ 55.

When Sidhom spoke with Burke the next day to confirm his availability for testing on October 14 and 15, he "went into a rant" about having been terminated, asking: "Why would I test if I've been terminated?" and "How can I take a test if I am no longer an employee?"  Def. SOF ¶ 56.  Sidhom explained: "We are still allowing you to take the test.  We are trying to help you."  Def. SOF ¶ 56.  She tried to convince him to take the tests, but to no avail.  Def. SOF ¶ 56.  Burke asked for a letter stating that he had been terminated and said he would be suing Con Edison.  Def. SOF ¶ 56.  Although Burke does not dispute that he made these statements, he asserts that, in light of his status as "terminated," testing him was improper in the absence of a settlement agreement in which Con Edison agreed to rehire him.  Pl. SOF ¶ 56.  According to Griffin, in 16 years with the company, he had "never seen anyone terminated and they reach out to test after they fired them," that this was "100% wrong," and that "[i]f you're willing to test an employee and that testing could lead to that employee getting that job back . . . absolutely there should have been a settlement agreement."  Pl. SOF ¶ 56; Griffin Tr. 68-73, 81-86.

In April 2023, Burke's long-term disability payments were terminated.  Burke Decl. Ex. 13, ECF No. 60 (p. 95); Def. SOF Reply ¶ 96.  Under Con Edison's LTD Plan, only employees who qualified for Social Security Disability Insurance Benefits (SSDI) could continue to receive LTD benefits after 24 months, and Burke did not qualify for SSDI.  Pl. SOF ¶ 96; Def. SOF Reply ¶ 96.  On May 4, 2023, Burke received a letter from the New York State Department of Labor ("DOL") informing him that the DOL had "received information that indicates you may have quit your job" with Con Edison and requesting further information to determine his continuing eligibility for unemployment benefits.  Burke Decl. Ex. 14.  As of March 2025, Burke was being treated for severe depression.  Pl. SOF ¶ 98; Burke Decl. Ex. 15.

11

**B. Procedural History**

Burke filed this action on March 13, 2023.  *See* ECF No. 1.  On September 13, 2024, Con Edison filed its Motion for Summary Judgment.  *See* ECF No. 33.  Shortly before Burke's response was due, his attorney, Maurice S. Pianko, moved to withdraw as counsel and to stay summary judgment briefing for 60 days to allow Burke to obtain new counsel.  *See* ECF Nos. 46-47.  The Court granted the request in part, staying summary judgment briefing until further notice and instructing Burke to either (1) retain new counsel and have that counsel file a notice of appearance in this case, or (2) file a letter with the Court indicating that he intended to proceed pro se.  *See* ECF No. 48.  Burke subsequently declared his intention to proceed pro se and requested assistance from the City Bar Justice Center.  *See* ECF No. 51.  The Court provided instructions on how to seek assistance from the City Bar Justice Center, ECF No. 52, and subsequently granted Pianko's motion to withdraw as counsel, ECF No. 53.  The Court also set an extended schedule for the remainder of summary judgment briefing, ECF No. 53, which it later extended twice, ECF Nos. 55 & 57.  Burke filed his Opposition, pro se and with assistance from the City Bar Justice Center, on May 7, 2025.  ECF No. 58.  Con Edison filed its Reply on May 28, 2025.  ECF No. 61.

## LEGAL STANDARD[3]

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

---

[3] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

*Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, the court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affs*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236. But the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

**DISCUSSION**

I.    **ADA**

    **A. Legal Principles**

ADA employment discrimination claims are subject to the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). The Second Circuit has defined the plaintiff's prima facie burden, in disability discrimination cases involving allegations of both adverse employment action and failure to provide a reasonable accommodation, as follows:

> To establish a prima facie case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability. Similarly, to establish a prima facie case for failure to provide a reasonable accommodation, a plaintiff also must satisfy the first three factors, but for the fourth factor, he must show by a preponderance of the evidence that his employer refused to make a reasonable accommodation.

*Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).

    **B. Burke's Discrimination Claim**

Burke contends that his termination as a Gas Troubleshooter (and Con Edison's refusal to return him to that position on light duty) constitutes unlawful discrimination on the basis of disability. Con Edison argues that Burke has failed to establish the third element of his prima facie case of disability discrimination because lifting, pulling, and pushing up to 50 pounds were essential functions of the job, and it is undisputed that Burke's restrictions prevented him from performing those functions. The Court agrees. Burke has failed to present evidence that he was

qualified for the position of Gas Troubleshooter, with or without reasonable accommodation, after his injury.

"The ADA prohibits discrimination in employment against 'a qualified individual on the basis of disability.'" *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 228 (2d Cir. 2017) (quoting 42 U.S.C. § 12112(a)). "A 'qualified individual' is defined as one who, 'with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Id.* (quoting 42 U.S.C. § 12111(8)). "In other words, employers may not discriminate against people with disabilities that do not prevent job performance, but when a disability renders a person unable to perform the essential functions of the job, that disability renders him or her unqualified." *Id.*

In evaluating whether a job function is "essential," courts consider

(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

*Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (quoting 29 C.F.R. § 1630.2(n)). Courts "must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position, but no one listed factor will be dispositive." *Stevens*, 851 F.3d at 229.

Here, the undisputed evidence, viewed in the light most favorable to Burke, compels the conclusion that the ability to lift, push, pull, and carry objects weighing up to 50 pounds was at all relevant times an essential job requirement for Con Edison Gas Troubleshooters.

*First*, Con Edison's own judgment is that this is an essential job function, as reflected in the declaration of Robert Kulpa, Section Manager of Bronx GDS Field Operations from June 2015 to May 2022.  *See* Kulpa Decl. ¶¶ 7-8, 12-16, 20-21.  The Court owes "considerable deference" to that determination.  *Stevens*, 851 F.3d at 229.

*Second*, the written job description for the Gas Troubleshooter position sets forth, under a list of "Physical Demands": "Must perform heavy manual labor; i.e. pushing, pulling, and lifting up to 50 pounds."  Def. SOF ¶ 12; Kulpa Decl. ¶ 16 & Ex. A at 2, ECF No. 41-1.  Although Burke protests that this job description "is not specific to the gas emergency department" in which he worked but rather "describes the full range of demands for all departments within Bronx GDS," Pl. SOF ¶ 12(b), he does not dispute that the Emergency Gas Troubleshooter job requires lifting and carrying objects, such as tool bags, meters, and pipes, "that weigh up to 50 pounds and more," *id.*  Moreover, in reviewing the job description during his deposition, he testified: "Lifting up to 50 pounds is correct."  Burke Tr. 69-71, 74.  The job description therefore supports the conclusion that this was an essential function of the job.

*Third*, Defendant argues that the actual amount of time spent lifting, pulling, and pushing objects weighing up to 50 pounds or more is immaterial because of the nature of the position as an emergency response role, noting that "although a firefighter may not regularly have to carry an unconscious adult out of a burning building, the consequence of failing to require the firefighter to be able to perform this function would be serious."  Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Br.")  at 13-14 (quoting 29 C.F.R. Part 1630, App., Section 1630.2(n)), ECF No. 34.  The Court agrees.  Burke's argument to the contrary focuses on the relative infrequency of needing to lift, pull, or push items weighing 50 pounds *and up*, rather than *up to* 50 pounds, which is not the relevant question given Burke's 20-pound restriction.  *See* Pl.'s Mem. Opp'n. Def.'s Mot. Summ.

J. ("Pl.'s Br.") at 6, ECF No. 58 (citing, e.g., Burke Decl. ¶ 12 (stating that most manhole covers weigh 20 to 50 pounds and that Con Edison policy required two individuals to move manhole covers weighing more than 50 pounds)). Burke does not meaningfully dispute that lifting, pushing, or pulling objects weighing between 25 and 50 pounds was a regular part of the job. *See, e.g.*, Pl. SOF ¶12. Accordingly, this factor favors Defendant.

*Fourth*, the consequences of being unable to perform the job would be severe. Defendant presents evidence that a Gas Troubleshooter responding to a gas emergency would often need to perform physically demanding tasks that required lifting and carrying objects weighing up to 50 pounds and more, such as manhole covers and emergency response tools, and exerting comparable torque strength to shut valves with a wrench. As Kulpa testified, "if the Gas Troubleshooter is unable to expeditiously perform these tasks, the gas leak could keep flowing, and the slightest spark could cause a catastrophic explosion." Kulpa Decl. ¶ 8. Burke does not meaningfully dispute this: he argues that Gas Troubleshooters would sometimes be dispatched in teams, such as when it was known in advance that a job would require lifting *more than* 50 pounds, but he does not dispute that emergencies required Gas Troubleshooters to lift *up to* 50 pounds acting alone. *See* Pl.'s Br. 7. This factor therefore strongly favors Con Edison.

*Fifth*, the terms of the agreement with the union specify that the purpose of the Gas Troubleshooter position was to "perform emergency response functions," which, as discussed above, requires the ability to lift, push, pull, and carry objects weighing up to 50 pounds and more, and to exercise comparable torque strength in twisting valves and pipes. *See* Yepez Decl. ¶ 3 & Ex. A, ECF No. 39 & 39-1. Burke does not contest this. Accordingly, this factor favors Con Edison.

17

*Finally*, Defendant's uncontroverted evidence as to the work experience of past incumbents in the job and current incumbents in similar jobs demonstrates that the work of a Gas Troubleshooter required lifting, pulling, and pushing up to 50 pounds.  For example, Pablo Hernandez, a former Emergency Gas Troubleshooter, testified that the job regularly required lifting and carrying objects weighing between 20 and 40 pounds, such as tool bags, heavy-duty pipes, wrenches, and meters, and sometimes objects weighing significantly more, such as manhole covers and meters.  *See* Hernandez Tr. 22-24, 35-36, 83-87, ECF No. 43-19.  And former Gas Troubleshooter Donald ("Donnie") Fox testified that the work of Gas Troubleshooters in the Meter Group "always required lifting and carrying meters, equipment, and tools that weigh more than 25 pounds," and "cannot be done by someone who is unable to lift or carry more than 25 pounds." Fox Decl. ¶ 2, ECF No. 40.  Burke offers no evidence to rebut this.  *See* Pl.'s Br. at 6-7.  The final two factors therefore also support Con Edison.

In sum, there is no genuine dispute that lifting, pushing, and pulling objects weighing up to 50 pounds was an essential function of the Gas Troubleshooter position.  Burke, who was medically restricted from lifting objects weighing more than 20 or 25 pounds, was therefore not qualified within the meaning of the ADA.

Burke argues that Con Edison could have accommodated him by, for example, assigning him a partner who could help with lifting or assume responsibility for lifting altogether.  *See* Pl.'s Br. at 9.  But a "reasonable accommodation can never involve the elimination of an essential function of a job."  *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003).  As Defendant observes, the proposal to assign Burke a partner who would do the heavy lifting is "fundamentally at odds with the very purpose of an Emergency Gas Troubleshooter—to act as a first responder, often arriving at the scene alone, with the ability to take immediate action to

address the gas leak, mitigate the hazard, and make the situation safe." Def.'s Reply Mem. ("Def.'s Reply") at 4-5, ECF No. 61.    Although Burke presents evidence that Emergency Gas Troubleshooters occasionally worked in pairs, such as when dispatched to less safe areas or at certain hours of the night, *see* Pl. SOF ¶ 15, that does not mean it would have been a reasonable accommodation for Con Edison to assign a partner to accompany him at all times, indefinitely.

Burke points to the example of Donnie Fox, who was allowed to work in a light-duty capacity after experiencing medical issues in 2021.  *See* Pl.'s Br. at 9-10 ("Mr. Fox's disability prevented him from driving, so in order to allow Mr. Fox to continue to work as a Gas Troubleshooter, ConEd provided Mr. Fox with an assignment in which he always worked with a partner, and that partner was tasked with handling all of the driving.").  But Fox's situation was different in several respects: Fox was assigned to meter work, not emergency gas work; his medical restrictions were on driving and working in the field alone, not on lifting; and he maintained his operator qualification throughout his time at Con Edison, while Burke's lifting restrictions would have prevented him from taking the exams to renew his qualification. Def. SOF ¶¶ 59, 62, 63.[4]  It was therefore possible for Con Edison to accommodate Fox's medical restrictions by assigning him to conduct meter work in a two-person crew where his partner did all the driving; his restrictions did not prevent him from fulfilling the essential functions of his particular role.  *See* Pl.'s Br. at 9-10; Def. SOF ¶ 61.  Burke's permanent restriction on lifting, however, could not reasonably be accommodated in the same way.

---

[4] Burke does not meaningfully dispute these facts.  Although he presents evidence that Fox sometimes needed help with lifting, he does not dispute that Fox did not have a formal lifting restriction.  Pl. SOF ¶ 62.  Meanwhile, Fox testified that, after he returned to work with restrictions on driving and working alone, he would "lift and carry more than 25 pounds on a regular basis" in a "typical work week."  Fox Decl. ¶ 4, ECF No. 40.

Because Con Edison has presented unrebutted evidence that Burke was not qualified to perform the essential functions of a Gas Troubleshooter, with or without accommodation, Burke's ADA claims based on Con Edison's refusal to return him to that position are dismissed.

### C. Burke's Failure-to-Accommodate Claim

Although Burke's preference was to return to his Gas Troubleshooter duties, he also contends that Con Edison failed to accommodate him via Con Edison's C-6 Program for employees with permanent disabilities. *See* Pl.'s Br. at 11; Pl. SOF ¶¶ 46, 58, 59, 90. Defendant argues that Burke has failed to make out a claim for failure to accommodate because (1) he was not eligible for the C-6 program and (2) he rejected Con Edison's offer to test for three clerical positions in October 2021, which were the same kinds of positions that would have been available through C-6. *See* Def.'s Reply at 2 & n.2. Here, the Court concludes that there are issues of fact that preclude summary judgment.

Con Edison's C-6 program is a collectively bargained benefit under which employees with permanent medical restrictions are given six months to train, on Company time and at their regular rate of pay, for a full-time clerical or administrative position consistent with their medical restrictions. Def. SOF ¶ 51. Con Edison argues that Burke was "not eligible" for the C-6 program and that "any challenge to that ineligibility was forfeited by his abandonment of his union contract grievance," Def.'s Reply at 2 (citing Burke's admission of the statements in paragraphs 51, 53, and 57 of Defendant's Rule 56.1 Statement). But Con Edison misrepresents the cited paragraphs and supporting evidence, which say nothing about Burke's being ineligible for C-6 and provide no support for the notion that Burke's withdrawal of his union grievance forfeited any challenge to

his ineligibility.[5]  To the contrary, according to Con Edison's own statements of undisputed fact, once Burke's medical restrictions were reclassified from "temporary" to "permanent," he "would have been eligible for" the C-6 program.  Def. SOF ¶ 51; Pl. SOF ¶ 51.  And Con Edison has consistently represented that Burke's restrictions were, in fact, permanent.  *See, e.g*, Def. SOF ¶ 58; Def.'s Br. at 5, 20-22; Frankel Decl. ¶ 15 ("My understanding was that his medical restrictions were permanent in nature.").  A reasonable jury could therefore conclude that Burke was eligible for the C-6 program.

Con Edison, however, also argues that Burke *was* offered an opportunity to test for "the same types of clerical positions" as those available through C-6, but he rejected that opportunity.  Def. Reply at 2 n.2.  Burke does not dispute that he turned down the offer to test for three clerical positions when he spoke with Sidhom on the phone on October 8, 2021, but he argues that he "refused to test in the absence of the correct procedures in order to protect his rights."  Pl. SOF ¶ 56.  According to Griffin, it was inappropriate to offer to test Burke *after* he had already been terminated without a settlement agreement in place to re-hire him.  Pl. SOF ¶ 56.  The parties' dispute here appears to come down to a misunderstanding: Burke believed (based on Con Edison's erroneous classification of him) that he had already been terminated, while Con Edison employees were still working on finding him an accommodation.

Based on the evidence in the record, a reasonable jury could conclude that Con Edison bore responsibility for this misunderstanding.  The ADA "contemplates that employers will engage in

---

[5] According to Con Edison, Burke's union grievance "sought the remedy of reinstatement as a Gas Troubleshooter in a 'restricted duty' capacity," Def. SOF ¶ 53, not his reassignment to a clerical position under the C-6 program.  Con Edison does not substantiate its assertion that Burke's withdrawal of his grievance affected his rights under the contract to participate in the C-6 program. In any event, Burke has rights under the ADA separate and apart from his rights under the contract.

'an "interactive process" with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated.'" *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (quoting *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000); *see also* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation."). Where, as here, an employee's disability is known to the employer, the "employer is required to act proactively and engage in an interactive process to accommodate the disability of an employee even if the employee does not request accommodation." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 642 (2d Cir. 2012).

Here, Con Edison acknowledges the "lack of communication" regarding Burke's employment status. Def. SOF Reply ¶ 93. It does not dispute that it failed to inform Burke that his termination in the system was merely an administrative error and that his case was proceeding to the ARC. Def. SOF Reply ¶¶ 92, 94. In internal communications, Con Edison's own employees described the situation as "a mess" and said that the "process needs to be improved." Burke Decl. Ex. (p. 44) & Ex. 5 (p. 46). And on several occasions, when a Con Edison representative suggested updating Burke or Griffin on his case or fixing his status in the system, no action was taken. Burke Decl. Ex. 4 (p. 40), Ex. 5 (pp. 46, 47), Ex. 6 (p. 60), ECF No. 60. A jury could therefore conclude that Con Edison failed to engage in an interactive process with Burke despite the availability of a reasonable accommodation through the C-6 program.

Moreover, a jury could find that Con Edison's offer to let Burke test for three positions with only one week's notice, while on "no pay" and "no benefits" status, was not a reasonable accommodation and was reasonably rejected by Burke. *See* Def. SOF ¶ 56, Def. SOF Reply ¶ 94.

It is undisputed that other employees with permanent medical restrictions were given *six* months to train for a clerical position, "on Company time and at their regular rate of pay," through the C-6 program.  Def. SOF ¶ 51.  Particularly in light of its miscommunications about Burke's employment status, Con Edison had an obligation to explore the availability of accommodations through the C-6 program even after Burke rejected their initial offer—a duty that a reasonable jury could conclude it failed to discharge.  *Cf. Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951 (8th Cir. 1999) (reversing grant of summary judgment in favor of employer, where plaintiff rejected employer's proposed accommodation in a letter stating that "[d]emotion or termination would not be consistent with employer reasonable accommodation duties," because district court's analysis ignored the employer's "obligation under the ADA to help determine the appropriate reasonable accommodation").

Based on the evidence in the record, a reasonable jury could find that Con Edison failed to accommodate Burke's disability when it kept him in the dark about his employment status and then offered him the chance to test for clerical positions without the benefits afforded to other employees through the C-6 program.  Accordingly, Burke's failure-to-accommodate claim under the ADA may proceed to trial.[6]

## II.    NYSHRL and NYCHRL

As explained above, the Court concludes that Burke's ADA claim based on Con Edison's failure to reinstate him as a Gas Troubleshooter fails as a matter of law, but his ADA claim for failure to accommodate may proceed to trial.  "Similar requirements apply to claims of failure to accommodate brought under the NYSHRL or the NYCHRL," *Williams v. MTA Bus Co.*, 44 F.4th

---

[6] On summary judgment, Con Edison does not offer any legitimate, non-discriminatory reason for failing to place Burke in the C-6 program or offer him a commensurate accommodation.

115, 125 (2d Cir. 2022), and the parties have not offered any reason why Burke's NYSHRL and NYCHRL claims should not rise and fall with his ADA claims. Accordingly, Burke's claims under the NYSHRL and NYCHRL based on the failure to reinstate him to his prior position are dismissed, but his claims based on failure to accommodate him in a clerical position may proceed.

## III. Race Discrimination

Burke, who is Black, also brings claims for race and color discrimination under Title VII, the NYSHRL, and the NYCHRL based on the alleged differential treatment of his white coworker, Donnie Fox. *See* Pl.'s Br. at 18; Compl. ¶¶ 24-25, 41, 43; Burke Tr. 180-81. But it is undisputed that Fox was assigned to a different specialty than Burke (meter work rather than emergency gas work); that his medical restrictions were different from Burke's (restrictions on working in the field alone and on driving rather than on lifting); and that he, unlike Burke, maintained his operator qualification for all tasks required for his job throughout his career with Con Edison. Def. SOF ¶ 61-63; Pl. SOF ¶¶ 61-63.[7] Accordingly, no reasonable jury could find that Fox was similarly situated to Burke in all material respects, and Burke's claims must be dismissed. *See Toombs v. N.Y.C. Hous. Auth.*, 830 Fed. App'x 665, 667-68 (2nd Cir. 2020) (affirming summary judgment for employer where plaintiff provided no evidence to support her claims that co-workers of a different race were treated more favorably than she and were "'similarly situated in all material respects'" (quoting *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2nd Cir. 1999))).

---

[7] As noted above, Burke presents evidence that Fox sometimes needed help with lifting, but he does not dispute that Fox did not have a formal lifting restriction. *See supra* n.5; Pl. SOF ¶ 62.

## CONCLUSION

For the reasons given above, Defendant's motion is **GRANTED IN PART and DENIED IN PART**.  Specifically, summary judgment is **GRANTED** as to Plaintiff's ADA, NYSHRL, and NYCHRL claims based on failure to return him to his position as a Gas Troubleshooter; these claims are dismissed.  Summary judgment is also **GRANTED** as to Plaintiff's Title VII, NYSHRL, and NYCHRL claims for race discrimination; these claims are dismissed.  Summary judgment is **DENIED** as to Plaintiff's ADA, NYSHRL, and NYCHRL claims based on failure to accommodate; these claims may proceed to trial.

By **October 3, 2025**, the parties are directed to submit a joint letter stating their availability for trial in April, May, and June 2026.  The parties shall further indicate whether they request a referral to the District's mediation program or to the assigned Magistrate Judgment for a settlement conference, and/or whether Plaintiff intends to obtain new counsel for trial.

The Court will hold a case management conference on **October 7, 2025 at 11:00 a.m.**  The parties should join the conference by dialing (646) 453-4442 and entering the conference ID: 926 496 688, followed by the pound sign (#).

The Clerk of Court is respectfully directed to close the motion at ECF. No. 33.

SO ORDERED.

Dated: September 19, 2025

New York, New York

_____

DALE E. HO
United States District Judge